## BERRY ASPHALT COMPANY v. APEX OIL PRODUCTS COMPANY.[1]

May. 7, 1943.

No. 33,428.

*Henderson, Schwartz & Halpern* and *Carl K. Lifson,* for appellant.
*Nordlin, Oliver & Pleva,* for respondent.

HENRY M. GALLAGHER, CHIEF JUSTICE.
Plaintiff sued to recover a balance of $917.59 alleged to be due·

[1]Reported in 9 N. W. (2d) 437.

from defendant on the purchase price of eight tank cars of lubricating oil. Defendant admitted the sale and delivery of the oil and counterclaimed for breach of warranty. The case was tried to the court and resulted in findings, conclusions, and an order for judgment for defendant for $339.26. Plaintiff appeals from an order denying its motion for amended findings or a new trial.

Plaintiff, an Illinois corporation with offices in Chicago, is engaged in the business of producing, refining, and selling lubricating oils. Defendant is a Minnesota corporation with offices and a plant in Minneapolis. It is engaged in the business of blending and packaging lubricating oils for sale. Negotiations leading up to the making of the contract here involved were initiated April 28, 1941, by a letter from Roy W. Francis, a salesman for plaintiff, to Howard Hornibrook, president and general manager of defendant, which reads:

"Have to move several cars of the following for shipment over the month of May and if you can use any of these oils can name you a very good price.

"100 at 100 2-2 1/2 color—40 pour test

"200 at 100 2 1/2–3 color—35 pour test

"These oils are now stable in color, green cast. Upon receiving your inquiries as to what grades you are interested in will give you price over the phone which if you have any place to use them do not believe you can afford to miss this deal."

Following receipt of the letter, Hornibrook telephoned Francis and asked for prices and samples, which were promptly furnished. The samples were of oil described in the trade as "200 @ 100 neutral 2 1/2 to 3 color." The expression "200 @ 100" was explained to mean a grade of oil having a viscosity of 200 at 100 degrees temperature. The color designated is one of the eight standard colors of lubricating oil established by the oil industry, measured by an instrument known as a "color-o-meter." It was also explained that the color range of lubricating oils is from 1 minus to 8 plus, the oil being progressively darker in the higher numbers and lighter

in the lower, the plus or minus indicating a shade darker or lighter, respectively, than the corresponding number to which it is affixed. The oil sold to defendant was described as a pale oil.

A few days after the telephone conversation Francis went to Minneapolis and had an interview with Hornibrook, following which on May 8, 1941, defendant gave plaintiff a written order for ten 8000-gallon tank cars of lubricating oil described in the order as "200 @ 100 Neutral (as per sample)" at a price of 5¾ cents per gallon. The order provided that the first car was to be shipped "at once" and the last on "June 30." The others were to be shipped at intervals of about one week. Plaintiff confirmed the order in writing on May 9.

Hornibrook testified that when he delivered the order he gave Francis a letter addressed to plaintiff. Francis denied that he received the letter. A copy of it was received in evidence over defendant's objection and reads:

"Enclosed, herewith, you will please find our purchase order 5665 for ten cars of your 200 @ 100, 2 1/2 to 3 color Neutral.

"I am giving you this order with the understanding that this oil is now stable in color and is guaranteed as such by the Berry Asphalt Company.

"If we should run into any trouble on this oil darkening in color in our storage, we will expect the Berry Asphalt Company to stand behind us for the full cost of any expense that we may be forced to pay on replacement."

The first carload of oil delivered met the specifications. The next seven cars were not of the color prescribed but were of a darker color. All of the oil continued to darken in color in defendant's storage tanks. The last two cars were not delivered and are not here involved, as the parties agreed to a cancellation as to them.

While there was some dispute between the parties at the trial as to the meaning of the warranty, it is conceded for the purpose of this appeal that there was a warranty and a breach of it. In

any event, the trial court so found; and, while plaintiff assigned such finding as error, it did not argue the point in its brief or orally. It predicates its claim for reversal on these grounds: (1) That the contract between the parties provided an exclusive remedy for breach of warranty, to which defendant failed to resort, thereby precluding the assertion of any other ground of liability therefor; (2) that defendant failed to give sufficient and timely notice of the breach to plaintiff as required by the uniform sales act, Minn. St. 1941, §§ 512.49, 512.69, 512.71 (Mason St. 1927, §§ 8423, 8443, 8445); and (3) that the trial court applied an incorrect measure of damages.

■ Plaintiff contends that defendant's letter of May 8 became a part of the purchase contract and that it established an exclusive remedy to which defendant was required to resort in order to assert a breach of warranty. This contention is somewhat at variance with the position taken by plaintiff at the trial, where its witness Francis denied having ever received the letter or having known of its existence. But, inconsistencies aside, it seems to us that the letter cannot bear the meaning ascribed to it by plaintiff. The statement, "I am giving you this order with the understanding that this oil is now stable in color and is guaranteed as such," adds nothing to the representation contained in the letter of April 28, 1941, from Francis to Hornibrook. Nor does the language, "If we should run into any trouble on this oil darkening in color in our storage, we will expect the Berry Asphalt Company to stand behind us," indicate the choice of a specific remedy to be pursued by the buyer to the exclusion of all other remedies available for a breach of warranty. At most, it expressed a warning to plaintiff that defendant expected to receive the kind and grade of oil it had ordered, and that it expected plaintiff to stand behind its product. Of note is the fact that the letter is informal in style and was written by a person who is a layman as to the law. The trial court correctly determined that the parties did not intend to limit defendant to the remedy expressed in the letter.

Plaintiff cites many cases in support of its point that, where the

contract of the parties expressly provides a remedy by which the buyer will assert any claim for breach of warranty, the remedy so provided is exclusive and the buyer must resort to it before he may assert a different remedy. With that rule we are in full accord. Rowell v. Oleson, 32 Minn. 288, 20 N. W. 227, 1884; Morris & Co. Inc. v. Power Mfg. Co. (6 Cir.) 17 F. (2d) 689; Beckett v. Gridley, 67 Minn. 37, 69 N. W. 622; Helvetia Copper Co. v. Hart-Parr Co. 142 Minn. 74, 171 N. W. 272, 767. For reasons heretofore stated, the rule is inapplicable in the present case.

■ On the question of notice, it is admitted that defendant's president and general manager complained to plaintiff's salesman, Francis, concerning the quality of the oil and that the latter made a special trip to Minneapolis, with plaintiff's consent and authorization, to investigate the complaint. Mr. Hornibrook and Mr. Francis had had dealings in the oil business before, and it is admitted that Mr. Hornibrook had theretofore complained about oil turning dark. Plaintiff brought in evidence tending to show a custom in the oil business that the buyer of a carload of oil ordinarily inspected it immediately and if it was found to be not as ordered he would not accept it, and that if the buyer did accept it and take it into his own storage tanks he could not thereafter complain. Hornibrook testified that the custom was to check tank cars of oil immediately for quantity; but that the buyers did not hold a tank car while they made all the tests of quality. Furthermore, the trial court found as a fact—and the evidence is amply sustaining—that plaintiff's salesman warranted that the oil would be stable in color and that it would not darken appreciably. It is admitted that there is no way to test oil to determine whether its color will remain stable in the future. Obviously, defendant would not be able to assert a breach until the defect arose. The facts here established require the conclusion that defendant gave timely and adequate notice of the breach of warranty within the meaning of *Id.* §§ 512.49, 512.69, 512.71 (§§ 8423, 8443, 8445).

■ The trial court assessed defendant's damages in the amount of the difference between the contract price of 5¾ cents per gallon

and the value of the oil actually delivered, which was found to be 4 cents. This finding is adequately sustained by the evidence. Against this amount—and the court's arithmetic is not challenged—was set off the value, at 4 cents a gallon, of the last two tank cars delivered to and received by defendant, for which it admittedly did not pay. Plaintiff claims the setoff should have been allowed at the contract rate. However, defendant was not required to pay for a quality it did not receive. The findings show that it received an inferior quality and that it was worth only 4 cents a gallon. There were conflicts in the testimony concerning value. These have been resolved in defendant's favor, and the evidence amply sustains the findings thereon.

Affirmed.